**ATEC, INC., Plaintiff,**

v.

**SOCIETE NATIONALE INDUSTRIELLE AEROSPATIALE, Defendant.**

**Civ. A. No. H–85–5607.**

United States District Court, S.D. Texas, Houston Division.

June 5, 1992.

John R. Feather, Vaden Eickenroht, Thompson and Boulware, Houston, Tex., for plaintiff.

Albert B. Kimball, Jr., Pravel, Gambrell, Hewitt, & Kimball, Houston, Tex., James R. Myers, James R. Laramie, George F. Pappas, Venable, Baetjer, Howard & Civiletti, Washington, D.C., for defendant.

## MEMORANDUM OPINION

SINGLETON, Senior District Judge.

This is an action for trademark infringement under the Lanham Act, 15 U.S.C. § 1114, for false advertising, false designation of origin, and false description under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and for trademark counterfeiting under 15 U.S.C. §§ 1114 and 1116(d) and 18 U.S.C. § 2320. Plaintiff also has brought pendant claims under Texas law.

This matter was tried to the bench. At the close of Plaintiff's case this Court orally granted defendant's motion to dismiss under Fed.R.Civ.P. 41(b). The Court now details the reasons for that ruling.

## I.

Plaintiff Atec, Inc., is a Texas corporation; Defendant Aerospatiale Societe Nationale Industrielle, S.A. is a French corporation. Both produce electronic testing equipment used for various purposes in the aviation industry. In 1978 Aerospatiale registered the mark "ATEC" for use on its equipment.[1] Subsequently, Atec attempted to register the mark "ATEC" and was refused because of Aerospatiale's priority. On Atec's petition, the Trademark Trial and Appeal Board (hereinafter "TTAB") cancelled Aerospatiale's registration.[2] Aerospatiale did not appeal the cancellation, and Atec registered its mark.[3] Atec filed this action after Aerospatiale used the disputed mark in an American aviation magazine and installed a system bearing the mark in Miami.[4] We have no cause to address the question of whether Aerospatiale, which had been in negotiation with Atec, had reason to think it had Atec's permission to use the disputed mark in the United States.

## II.

The analysis we must follow has been neatly delineated for us by the Fifth Circuit in several decisions, including *Oreck Corp. v. U.S. Floor Systems*, 803 F.2d 166 (5th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). We quote:

> To prove its claim of trademark infringement, [Plaintiff must show that Defendant's use of the disputed mark] was likely to create confusion in the minds of potential buyers as to the source, affiliation, or sponsorship of the parties' products ... The question of likelihood of confusion is decided by considering a variety of factors including: (1) strength of the Plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of adver-

tising media used; (6) the Defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers.

803 F.2d at 170 (citations omitted).

These factors are not to be applied mechanically. The list is not exhaustive, and other factors may be considered. *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 149 (5th Cir.1985). No one factor is dispositive, and the weight attached to each factor will vary from case to case. *Marathon Mfg. Co. v. Enerlite Products Corp.*, 767 F.2d 214, 218 (5th Cir.1985). A plaintiff may prevail on the question of likelihood of confusion although he is not supported by a majority of the factors. *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1159 (5th Cir.1982). The weight to be given to the various factors is a matter for the factfinder, and as long as it appears that all relevant proffered evidence was considered and that no impermissible inferences were drawn from that evidence, the factfinder's determination will not be overturned unless clearly erroneous. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 345 n. 9 (5th Cir.1984).

We see no reason in the instant case to consider factors other than those itemized in *Oreck*, and we proceed to consider them, but in slightly different order.

## III.

### (i) Strength of Atec's mark

"Atec" is not a "strong" trademark. It is used by a number of third parties, and the generality of its components—the "a", possessing no intrinsic suggestiveness, and the "t—e—c", pointing vaguely to some spot in the vast realm of technology—place it alongside other marks whose disputed

---

1. Federal Trademark Registration No. 1,104,-225, issued October 17, 1978.

2. Cancellation Proceeding No. 12,682, August 31, 1984 (attached as Exhibit C to Atec's brief in support of original complaint, file, # 2).

3. Federal Trademark Registration No. 1,340,-152, issued June 11, 1985.

4. The Aerospatiale system that has engendered this controversy is known as the "atec 5000".

components are in such common use that courts have held them not likely to cause confusion. *E.g., Sun Banks of Fla. v. Sun Fed. Sav. & Loan,* 651 F.2d 311 (5th Cir. 1981); *Holiday Inns, Inc. v. Holiday Out,* 481 F.2d 445, 448 (5th Cir.1973).

(ii) Similarity of mark designs

We deal in this case with three designs, one used by Aerospatiale and two used by Atec [5]:

It is only for the sake of thoroughness that we reproduce the marks pictorially: the important point of similarity is the use of the four letters a—t—e—c in that order, and we attach no significance whatever to the visual comparison of the three marks.[6] We are confident that our confessedly philistine indifference to the subtleties of graphic design is shared by almost everyone. We cannot imagine anyone not a connoisseur of graphic design distinguishing the two companies' marks on visual grounds, but we have no problem imagining an uninformed someone assuming that "atec" as depicted in Plaintiff's marks has something to do with "atec" as illustrated in Defendant's mark. We stress that this factor, as we understand it, assesses similarity with no regard whatever for the buyer's likely degree of sophistication, which will be considered *infra.* Clearly this factor weighs in Atec's favor.

(iii) Similarity of products

(viii) Degree of case exercised by potential purchasers

It seems to the Court that these two factors cannot be considered separately. Similarity of products, unlike similarity of marks, cannot be assessed in a vacuum, but only with reference to the expertise of the purchaser; and here there is enough evidence to tilt the scales in Aerospatiale's favor.

The only Aerospatiale product involved in this lawsuit, the atec 5000, is an extremely expensive item, costing between two and five million dollars, one of Atec's witnesses, Don Dean, a member of Atec's board of directors (II–40–24).[7] The essential function of the atec 5000 is to test the software involved in the functioning of a jet aircraft. It would appear that Atec's products, most of which are priced in the tens of thousands of dollars, and none anywhere in the neighborhood of the atec 5000's price,[8] do, to some degree, overlap the atec 5000 in function, in that their scope is not confined to testing purely mechanical components but includes testing some of the electronic readouts that monitor jet engine performance (I–102–23). Nevertheless, it appears to the Court that there is, in general, a substantial difference between the functions of Atec's products and those of the atec 5000: the former are for the most part employed to monitor the mechanical performance of propulsion systems, the latter exists solely to test software. This is, of course, a crude formulation, a layman's formulation, of what could no doubt be expanded to a treatise: but what is important is not how the Court perceives the differences, but how potential purchasers would. And this Court simply cannot believe that a corporation would shell out several million dollars for an atec 5000 without being minutely informed as to the precise capabilities of that system, which are not paralleled by any product

5. We have taken these reproductions from Aerospatiale's Memorandum of Points and Authorities in Support of Opposition to Atec's Motion for Partial Summary Judgment (file, no. 68).

6. We also attach no importance to the presence or absence on different occasions of "Inc.", which has caused a certain amount of squabbling in this litigation.

7. The trial transcript is cited by volume, page, and first relevant line.

8. The Court is not, of course, suggesting that the price differential is any reflection on the quality of Atec's products, but clearly it is relevant to the issue of confusion.

made by Atec (testimony of Atec CEO Jerome Maxwell.[9]

(iv) Identity of outlets and purchasers

At trial counsel for Aerospatiale reminded Don Dean that in 1988 he had averred under oath that "[f]or each fiscal year from 1981 to the present, Atec's revenues have been derived in excess of ninety-five percent from federal government contracts" (II–32–11). CEO Maxwell testified at trial that the figure was more like fifty percent, but he did not explain the discrepancy between that assessment and the fact that over a four-year period—from 1987 through 1990—Atec's gross revenues amounted to over thirty million dollars, of which only about $41,000 stemmed from sales of test equipment to commercial airlines (I–165–3; I–158–3).[10] Aerospatiale, on the other hand, does no military business at all in this country. The disjunction between Atec's purchasers and Aerospatiale's may not be complete, but it is not far from it.

(v) Similarity of advertising media used

The Court cannot attach much significance to this factor. In light of our remarks *supra* about the expertise of those who purchase systems like the atec 5000, the fact that Atec and Aerospatiale advertise in the same journals, if indeed that is the case, seems of slight importance.

(vi) Defendant's intent

The trial record is devoid of any indication that Aerospatiale intended to cut into Atec's business by employing the "ATEC" mark, which, we note, Aerospatiale has used since the 1960s, and which it owns in France.

(vii) Actual Confusion

Finally we reach what is perhaps the weightiest of the *Oreck* factors in assessing the likelihood of confusion: has Atec produced evidence showing instances of actual buyer confusion? More pointedly put, has Atec produced evidence of a single sale lost to Aerospatiale because of the "ATEC" mark?

Clearly, it has not.

Don Dean testified that Atec has never lost a sale to an Aerospatiale product bearing the Atec mark (II–43–18). Robert Johnson, a former employee of Atec who handled between ten and twenty thousand phone inquiries between 1977 and 1990, estimated that he had received perhaps 1500 calls from persons seeking information about other companies named Atec— and there are several, in widely diverse businesses[11]—but only five or so calls that had anything to do with Aerospatiale or the atec 5000 (II–84–25). Such a drop in the bucket will not support a finding of actual confusion. Nor has Atec produced any evidence whatever that anyone ever purchased any Aerospatiale system in the mistaken belief that Aerospatiale was affiliated with Atec.

### III.

The Court finds that Atec has failed to show likelihood of confusion, and cannot, therefore, demonstrate infringement.

It is, therefore the ORDER of this Court that:

(1) Defendant's motion to dismiss under F.R.Civ.P. 41(b) is GRANTED;

(2) This action is DISMISSED with prejudice.

---

9. Don Dean testified that Atec lacks the knowledge to develop a system like the atec 5000. II–41–19.

10. Maxwell did state, without giving numbers, that Atec made other commercial sales besides those of test equipment; but the fact remains that the type of equipment involved in this action accounts for an infinitesimal slice of Atec's sales.

11. II–100–8.